Eric T. Kanefsky, Esq.
Kevin J. Musiakiewicz, Esq.
Martin B. Gandelman, Esq.
**CALCAGNI & KANEFSKY LLP**
One Newark Center
1085 Raymond Blvd., 18th Floor
Newark, New Jersey 07102
T: (862) 397-1796
E: eric@ck-litigation.com
E: kevin@ck-litigation.com
E: mgandelman@ck-litigation.com

*Counsel for Plaintiffs Yellowstone Capital LLC*
*and Yitzhak Stern*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| YELLOWSTONE CAPITAL LLC and YITZHAK STERN, | Civil Action No. 2:25-cv-18001 |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| ARGONAUT INSURANCE COMPANY, | |
| Defendants. | |

Plaintiffs Yellowstone Capital LLC ("Yellowstone") and Yitzhak Stern ("Stern" and, together with Yellowstone, the "Yellowstone Parties"), by way of their Complaint against Defendant Argonaut Insurance Company ("Argo"), allege as follows:

### INTRODUCTION

1.      This dispute arises from a classic example of delay, deny, and defend.

2.      When the New York Attorney General ("NYAG") announced in 2018 that she was investigating the business practices of Yellowstone and served a subpoena in furtherance thereof, Argo expressly acknowledged the subpoena was a "notice of circumstances that may

give rise to a 'Claim'" and assured the Yellowstone Parties that coverage will be "afforded under [the policy] for any Loss incurred in connection with such circumstances" once "such circumstances result in a Claim."

3.      But ever since the NYAG commenced her enforcement action against the Yellowstone Parties (and others) in early 2024, Argo has done everything possible to shirk its clear contractual obligations.

4.      Argo first waited more than seven months after it received notice of the NYAGs enforcement action, and until the Yellowstone Parties notified it of their intent to pursue the carrier's internal appeals process, to issue its coverage determination.

5.      Argo then denied both Yellowstone and Mr. Stern *any* coverage for the nearly $3 million in defense costs they incurred or the more than $500 million in monetary losses they suffered based on grounds that are meritless and belied by the plain language of the policy and Argo's own course of conduct.

6.      First and foremost, the notion that Argo did not receive "adequate notice" of the NYAG's enforcement action is absurd.  As a threshold matter, (i) Argo expressly acknowledged that the subpoena served upon Yellowstone in 2018 was a "notice of circumstances" that later gave rise to formal claims asserted by the NYAG, and (ii) the policy plainly states that any subsequent claim arising from those circumstances "shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period**."  Even more compelling, in 2020, Argo determined that a substantively similar but entirely separate enforcement action initiated by the Federal Trade Commission ("FTC") was "interrelated" to the subpoena issued by the NYAG, and concluded that the claims made by the NYAG and FTC would be treated as a single claim,

deemed the date on which it received notice of the NYAG subpoena in 2018 as first notice of that single claim, and defended and indemnified Mr. Stern in connection with the FTC action.

7.      Second, Argo's reliance on the exclusion for false or deceptive business practices is woefully misplaced because (i) the NYAG's allegations of false or deceptive practices represent only a small component of the claims asserted against the Yellowstone Parties, and (ii) even if that were not the case, that exclusion does not apply to Mr. Stern, who himself has incurred defense costs and suffered losses far in excess of the policy's $3 million limit.

8.      Third, Argo's invocation of the "consent" provision is desperate and hollow. Argo had notice of the NYAG's investigation for more than five years before the enforcement action was even initiated and there was no scenario under which any of the insureds could have defended or settled the case within the policy limit.  In fact, the Yellowstone Parties exhausted the policy limit in defense costs before the completion of the pleading stage.

9.      Fourth, while the policy does exclude coverage for losses related to civil fines, penalties, disgorgement, restitution, or otherwise in connection with injunctive relief, (i) there is no exclusion for defense costs, which themselves far exceeded the policy limit, (ii) the bulk of the injunctive relief sought by the NYAG does not pertain to the Yellowstone Parties because they stopped taking on new business before the enforcement action was even commenced, and (iii) the $16.1 million in settlement monies paid by the Yellowstone Parties were not attributed to any particular claim or request for relief.

10.     Simply put, there is no valid legal or factual basis or justification for Argo's coverage position.  And now that the Yellowstone Parties have exhausted Argo's requirement that the parties submit any dispute to non-binding mediation before pursuing litigation and that non-binding mediation predictably proved to be a waste of the Yellowstone Parties' time and

money, the Yellowstone Parties bring this action to secure the policy limits to which they entitled and hold Argo accountable for its bad faith conduct.

**PARTIES**

11.     Yellowstone is a New York limited liability company.  At all times relevant to this action, including when the subject insurance policies were issued and during the respective coverage periods, Yellowstone's principal business address was located at 1 Evertrust Plaza, Suite 1401, Jersey City, New Jersey.

12.     Mr. Stern is a resident of the State of New Jersey with his principal address in Hillside, New Jersey.  At all times relevant to this action, Mr. Stern was the Chief Executive Officer of Yellowstone.

13.     Argo is a corporation formed under the laws of the State of Nebraska.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

15.     Venue is proper under 28 U.S.C. § 1391 because, among other reasons, (i) Mr. Stern is a New Jersey resident, (ii) at all relevant times, Yellowstone maintained its principal place of business in Jersey City, New Jersey, and (iii) many of the events giving rise to this action, including the acts covered under the subject policies, occurred in, were directed to, and/or originated from, New Jersey.

**FACTS COMMON TO ALL COUNTS**

**A.      The D&O Policy**

16.     Yellowstone purchased two consecutive Private PROtect/Directors & Officers ("D&O") policies.

4

17.     In or about June 2018, Argo issued Policy No. ML 7601979-2 to Yellowstone (the "Initial D&O Policy"), which incepted on May 25, 2018, and originally expired on May 25, 2019.[1] *See* Exhibit A.

18.     The Initial D&O Policy contains three Insuring Agreements relevant to this coverage dispute:

- ***Non-Indemnified Loss Coverage***: The Insurer pays Loss for Claims against Insured Persons when the Company does not indemnify them ("Insuring Agreement A");

- ***Company Reimbursement Coverage***: The Insurer reimburses the Company to the extent the Company indemnifies Insured Persons for Loss arising from Claims ("Insuring Agreement B"); and

- ***Company Liability Coverage***: The Insurer pays Loss of the Company itself for Claims against the Company for a Wrongful Act (Insuring Agreement C, together with Insuring Agreement A and Insuring Agreement B, the "D&O Coverage").

*See id.* at 16.

19.     As confirmed by the Declarations page, the Initial D&O Policy had a Maximum Aggregate Limit of Liability of $3 million for all Loss under the D&O Coverage and a retention of $50,000 for "Each **Claim**" made pursuant to Insuring Agreements B and C.

20.     There is no retention for Insuring Agreement A. *See id.* at 2 (emphasis in original).

21.     In or about November 2019, Argo renewed Yellowstone's coverage under Policy No. ML 7601979-3 for the October 25, 2019, through October 25, 2020, period (the "Renewal D&O Policy," together with the Initial D&O Policy, the "D&O Policy").

---

[1] The policy period was extended through July 25, 2019, under Endorsement No. 32.

22.     The Renewal D&O Policy also contained Insuring Agreements A through C and included the same $3 million "Limit of Liability" but the deductible for Insuring Agreements B and C was increased to $75,000. *See* Exhibit B at 2-3.

23.     The following definitions and conditions are those relevant to this dispute:

(a)     "**Insureds**" means the "**Insured Person(s)**" or the "**Company**" (*i.e.*, Yellowstone). *Id.* at 7 (emphasis in original).

(b)     "**Insured Person(s)**" include "any one or more natural persons who were, now are or shall become (i) a duly elected or appointed director, trustee, governor, management committee member, Manager, officer, in-house general counsel or controller of the Company, (ii) director of human resources, risk manager or their functional equivalent of the Company: or (iii) with respect to a **Company** incorporated outside of the United States, the functional equivalent of any of the foregoing provisions[.]" *Id.* at 7-8 (emphasis in original).

(c)     **Claim**. A "**Claim**" is defined to include, among other things: (i) "a written demand against any **Insured** for monetary damages, non-monetary or injunctive relief, including a written demand that the **Insured** toll or waive a statute of limitations pertaining to a **Wrongful Act**"; (ii) "a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading"; (iii) "a criminal proceeding against any **Insured** commenced by return of an indictment or similar document"; (iv) "an administrative or regulatory proceeding against any **Insured** commenced by the filing of a notice of charges or similar document"; or (v) "a civil, criminal, administrative or regulatory investigation of any **Insured** commenced by the service upon or other receipt by the **Insured Person** of a Wells notice, target letter or other written notice from the investigating authority identifying by name the **Insured Person** as an individual against whom a proceeding may be commenced." *Id.* at 23 (emphasis in original).

(d)     **Loss (incl. Defense Costs)**. "**Loss**" is the total amount an Insured is legally obligated to pay "on account of Claims made against them solely for Wrongful Acts," including damages, judgments, settlements, fee awards, and "Defense Costs," which includes "that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorney's fees and expert's fees) and expenses[.]" *Id.* at 6, 25 (emphasis in original).

(e)     **Wrongful Act**. "Wrongful Act" is defined broadly to include any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty "by an **Insured Person** while acting in his or her capacity as such and on behalf of the **Company.**" *Id.* at 27 (emphasis in original).

(f)     **Interrelated Claims**. "Interrelated Claims" are "**Claims** arising from, based upon, or attributable to the same **Wrongful Act** or **Interrelated Wrongful Acts**" and are deemed a single Claim "first made" at the time of the earliest such Claim or "notice of such **Wrongful Act** or any **Interrelated Wrongful Act** was given to the **Insurer**." *Id.* at 16 (emphasis in original).

(g)     **Consent (Defense/Settlement)**. The Renewal D&O Policy requires, among other things, that the Insured: (i) "give the **Insurer** full cooperation, assistance and information as the **Insurer** shall reasonably require"; (ii) "do nothing that shall prejudice the **Insurer's** position or its potential rights of recovery"; or (iii) "not undertake to negotiate to settle, offer to settle, or settle any **Claim** … [or] incur any **Defense Costs** or otherwise assume any contractual obligation, admit any liability, or stipulate to any judgment with respect to any **Claim** without the **Insurer's** prior written consent, such consent not to be unreasonably withheld." *Id.* at 14-15.

(h)    **Exclusion M (The "Business Practices Exclusion")**. Under the Renewal

D&O Policy, Exclusion M,[2] among other things, bars coverage solely with respect to Insuring

Agreement C for Claims against the Company "based upon, arising out of or attributable to any

actual or alleged price fixing, predatory pricing, restraint of trade, monopolization, anti-

competitive conduct, unfair competition or unfair business or trade practice or any interference in

another's contractual or business relationship," and includes "any actual or alleged violation of:

the Federal Trade Commission Act; the Sherman Act; the Clayton Act; any amendments to any

of the foregoing or any regulations promulgated pursuant to any of the foregoing; any statutory

or common law definition of unfair competition, or unfair business or trade practice; or any

provision of any federal, state, local or foreign statute regulation or common law relating to any

of the foregoing or actually or allegedly relating to any activity set forth in this exclusion." *Id*. at

30.

24.    The D&O Policy requires that any dispute or controversy arising under the Policy

be submitted to non-binding mediation as a pre-condition to commencing litigation (the "ADR

Requirement"):

> The **Insured(s)** and the Insurer shall submit any dispute or
> controversy under this Policy to either non-binding mediation or
> binding arbitration as described in this Subsection (the "ADR
> process").  Either the Insured(s) or the Insurer may initiate the
> ADR process by sending written notice to the other party
> designating which type of ADR process is being elected.  If within
> fourteen (14) days after such notice is given the parties disagree on
> the type of ADR process, the Insureds' preference shall control.
>
> * * * * *
>
> If the ADR process is non-binding mediation, and if the dispute is
> not resolved during the mediation process, then either party to the
> mediation may thereafter commence a judicial proceeding against

---

[2] The Initial D&O Policy includes a virtually identical exclusion—Exclusion Q. *See* Exhibit A at
23.

the other party with respect to such dispute, provided that neither party may commence such a judicial proceeding prior to ninety (90) days following termination of the mediation.

*Id.* at 8.

**B.    Chronology of Relevant Events**

**1.    The NYAG Launches an Investigation of Yellowstone.**

25.    In late November 2018, the NYAG served a subpoena *duces tecum* (the "Company Subpoena") on Yellowstone relating to its sale of merchant cash advances in New York and to residents of New York. *See* Exhibit C.

26.    Although the Company Subpoena does not identify Mr. Stern by name, it sought information regarding Yellowstone's purportedly unlawful business practices, which were necessarily dictated and directed by the Company's directors and officers, including Mr. Stern.

27.    More specifically, the Company Subpoena provides, in pertinent part, as follows:

> The Attorney General deems the documents and information requested by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest to determine whether Yellowstone Capital LLC and its affiliates have engaged in repeated or persistent fraudulent, illegal, and deceptive conduct relating to their sale of merchant cash advances in New York and to residents of New York and their servicing of such cash advances.

*Id.* at 1.

**2.    Argo Acknowledges that the Company Subpoena Is a "Notice of Circumstances" and that Coverage Would be Afforded to the Yellowstone Parties for Any Subsequent Related Claim.**

28.    After receiving prompt notice of the Company Subpoena from Yellowstone, Argo issued a letter dated June 28, 2019, in which it took the position that the Company Subpoena was not a "**Claim**" as defined in the D&O Policy. *See* Exhibit D.

29.    Argo nevertheless stated it would accept the submission of the Company Subpoena as a "notice of circumstances that may give rise to a **Claim**" and acknowledged that while the Company Subpoena "does not constitute a **Claim**," coverage will be "afforded under this Policy for any **Loss** incurred in connection with such circumstances" once "such circumstances result in a **Claim**." *Id.* (emphasis in original).

**3.    Argo Acknowledges that a Separate Enforcement Action Filed by the FTC Was "Interrelated" to the NYAG's Company Subpoena, Treated the Separate Actions as a Single Claim, Deemed the Date on the Which the Company Subpoena Was Served as the Date of First Notice of that Single Claim, and Defended and Indemnified Mr. Stern Against the FTC's Claims.**

30.    In 2020, the FTC commenced a related enforcement action in which it, too, alleged that Yellowstone, Mr. Stern (individually and as an officer of Yellowstone), and others engaged in unlawful and deceptive business practices in connection with sale and serving of merchant cash advances and sought injunctive, equitable, and monetary relief (the "FTC Action"). *See* Exhibit E.

31.    By way of example, the introduction to the complaint filed by the FTC (the "FTC Complaint") alleges as follows:

> The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC, 15 U.S.C. § 45(a), in connection with their business financing activities.

*Id.* at ¶1.

32.    The "Overview" section of the FTC Complaint likewise alleges as follows:

> 12. Since at least 2015, Defendants have advertised, marketed, and offered short-term, high-cost financing products to small business consumers in immediate need of funds. Defendants tout these products—often referred to as "merchant cash

advances" ("MCAs")—as a quick source of funds for consumers that do not qualify for bank loans or other traditional forms of financing. Defendants characterize their products as discounted purchases of consumers' future receivables to be repaid in a larger amount via daily installment payments purportedly based on a percentage of consumers' incoming business receipts.

14. Defendants engage in a pattern of deceptive and unfair conduct in connection with the marketing, advertising, and offering of their MCAs. They have misrepresented key aspects of their products, including their requirements that consumers provide collateral and personal guarantees, as well as the specific financing amount they will disburse to consumers.

*Id.* at ¶¶ 12 and 14.

33. By letter dated December 3, 2020, Argo agreed to provide coverage to Mr. Stern (and other directors and officers) in connection with the FTC Action and expressly stated that it "will provide coverage to [Mr. Stern and other directors and officers] under Insurance Agreement B as they are ***Insured Persons*** under the Policy." Exhibit F (emphasis in original).

34. As important, Argo concluded that because the FTC's allegations were "interrelated" to the Company Subpoena issued by the NYAG, the FTC Complaint and the Company Subpoena would be recognized as a single claim and that December 3, 2018, the date on which the Company Subpoena was served on Yellowstone by the NYAG, would be deemed as the date on which first notice of that single claim was received. *See id.*

**4.    The NYAG Serves a Subpoena on Mr. Stern.**

35. On or about September 13, 2022, the NYAG served a subpoena *duces tecum* on Mr. Stern (the "Individual Subpoena") for a deposition and documents in connection with his rolls as a director and officer of Yellowstone. *See* Exhibit G.

36.     At or about the same time, the NYAG also served subpoenas on Bart Maczuga, Vadim Serebro, Yellowstone's Chief Executive Officer and General Counsel, and Jeffrey Reece, Yellowstone's President.

37.     From that point through early 2024, Yellowstone and all four officers were represented by Proskauer Rose LLP and Yellowstone indemnified the directors and officers, including Mr. Stern, for all counsel fees incurred during that period.

**5.     The NYAG Serves the Yellowstone Parties with a Notice of Intent to Sue and Commences an Enforcement Action.**

38.     On or about January 8, 2024, the NYAG served the Yellowstone Parties with a copy of a Notice of Intent to Sue in which the NYAG notified them of her intent to commence an enforcement action alleging violations of various state statutes. *See* Exhibit H.

39.     Through the Notice of Intent to Sue, the NYAG, like the FTC, advised the Yellowstone Parties of her intent to commence litigation concerning their allegedly unlawful business practices, which purportedly violated New York's General Business Law, and seek "injunctive relief, restitution, rescission, civil penalties, an accounting, damages, disgorgement, costs, and such other relief as the court may deem just and proper." *Id.* at 1.

40.     But unlike the FTC Action, the bulk of the allegations related to purported violations of New York's banking and lending laws, including, most notably, the State's criminal and civil usury statutes:

> The intended litigation arises out of acts and practices that the Attorney General claims violate Executive Law § 63(12), General Business Law § 349, General Obligations Law § 5-501, Banking Law §§ 340 and 346, Penal Law § 190.40, and Debtor & Creditor Law §§ 273 and 274, including, but not limited to, the following:

> (a)     Repeated and persistent civil usury by lending money at interest rates exceeding 15 percent.

(b)    Repeated and persistent criminal usury by lending money at interest rates exceeding 25 percent.

(c)    Repeated and persistent lending at excessive interest rates without a license.

(d)    Repeated and persistent deception and fraud in the marketing, issuance, and servicing of "merchant cash advance" agreements, in actions taken to collect upon such agreements, and in causing merchants to enter into unconscionable agreements.

(e)    Engaging in an asset transfer that is voidable under Debtor & Credit Law §§ 273 and 274.

*Id.* at 2.

41.    Approximately two months later, on March 5, 2024, the NYAG initiated an enforcement action in the Supreme Cout of the State of New York, County of New York, entitled *People of the State of New York v. Yellowstone Capital, LLC, et al.* and bearing Index No. 450750/2024 (the "NYAG Enforcement Action"), against the Yellowstone Parties and other merchant cash advance-related companies and individuals by way of Verified Petition. *See* Exhibit I.

42.    The Verified Petition encompassed over 94,000 Yellowstone merchant cash advance agreements and was accompanied by a record over 2,100,000 pages, consisting of documents, information, and deposition testimony gathered, in large part, pursuant to the Company Subpoena, which Argo acknowledged as being a "notice of circumstances" as of December 2018.

43.    Consistent with the Notice of the Intent to Sue, the Verified Petition alleged that the Yellowstone Parties, among other things, violated the aforementioned statutes by, among other purported acts: (i) repeated and persistent civil usury by lending money at interest rates exceeding 16 percent; (ii) repeated and persistent criminal usury by lending money at interest

13

rates exceeding 25 percent; (iii) repeated and persistent lending at excessive interest rates without a license; (iv) repeated and persistent deception and fraud in the marketing, issuance, and servicing of "merchant cash advance" agreements, in actions taken to collect upon such agreements, and in causing merchants to enter into unconscionable agreements. *See id.* at ¶¶ 821-847.

44.     The Verified Petition also alleged that the Yellowstone Parties engaged in a fraudulent transfer of Yellowstone's assets that is voidable under Debtor & Creditor Law §§ 273 and 274. *See id.* at ¶¶ 848-860.

45.     And based upon those allegations, the NYAG asserted causes of action against the Yellowstone Parties and other defendants for (i) civil usury, (ii) criminal usury, (iii) making high interest loans without a license, (iv) fraud, and (v) deceptive business acts and practices. *See id.*

**6.     The Yellowstone Parties Move to Dismiss the NYAG's Verified Petition.**

46.      Yellowstone and Mr. Stern each moved to dismiss the Verified Petition in its entirety. *See* Exhibits J and K.

47.     Because New York courts have routinely held that merchant cash agreements involve the legitimate purchase of receivables and are not loans subject to New York's usury, banking, or lending laws, and consistently enforced Yellowstone's rights under the merchant cash advance agreements, the motions were based on sound and dispositive legal grounds.

48.     And because the Verified Petition encompassed more than 94,000 Yellowstone merchant cash advance agreements and was accompanied by a record of over 2,100,000 pages, the Yellowstone Parties spent substantial time, money, and resources preparing and filing their motions.

**7.    The Yellowstone Parties Reach an Extraordinarily Favorable Settlement with the NYAG.**

49.    Before the NYAG filed the Verified Petition, the Yellowstone Parties embarked upon what proved to be extensive negotiations with the NYAG with the single objective of reducing the Yellowstone Parties' financial exposure.[3]

50.    After many months of negotiations, the Yellowstone Parties reached a settlement agreement with the NYAG for just a small fraction of the NYAG's initial and revised demands, as well as the exposure they would have faced if the NYAG were to have prevailed on her claims and Yellowstone was required to return all of the $4,211,667,764 in receivables it purchased during the relevant period.

51.    Specifically, as memorialized in the Consent Orders and Judgments entered on January 16, 2025, Yellowstone was required to make a lump sum settlement payment of $3.4 million and Mr. Stern was required to make a lump sum settlement payment of $12.7 million. *See* Exhibits L and M (the "Consent Orders").

52.    Notably, the Consent Orders did not attribute or allocate the settlement payments made by Yellowstone or Mr. Stern to the resolution of any particular claim, including the NYAG's allegations of fraud and deceptive business practices.

53.    They instead expressly authorized the NYAG, "***in its sole discretion***," to apply any monetary relief to "restitution for Merchants and/or Guarantors, penalties, costs of investigation, or cost of administering restitution and debt relief." *Id.* at ¶¶ 8, 11 (emphasis added).

---

[3] From March 2019 until October 2021, the Yellowstone Parties and the NYAG entered a series of tolling agreements (collectively, the "Tolling Agreement").

**C.    Argo Inexplicably Denies Coverage for the NYAG Action.**

54.    On September 9, 2024, while the motions to dismiss were pending and long before any settlement was finalized, the Yellowstone Parties submitted a Notice of Covered Litigation to Argo in which they formally tendered the Verified Petition for defense and indemnity. *See* Exhibit N.

55.    After several months without a coverage determination, the Yellowstone Parties sent to Argo an update on February 6, 2025, in which they advised Argo that "following service of the notice of covered claim, [Yellowstone], along with Messrs. Stern and Reece, have entered into a settlement with" the NYAG, and enclosing the executed Consent Orders and Judgments." Exhibit O.

56.    In that update, the Yellowstone Parties reiterated their position that the Verified Petition is a covered "Claim" and reminded Argo of its June 28, 2019 letter in which Argo has accepted the Company Subpoena as a "notice of circumstances." *Id.*

57.    And when two more months passed without a coverage determination, the Yellowstone Parties notified Argo on April 24, 2025, of their intent to initiate the D&O Policy's ADR process.  *See* Exhibit P.

58.    Tellingly, however, it took Argo only one week to respond when the Yellowstone Parties finally threatened to avail themselves of the carrier's internal appeals process.

59.    Even more incredibly, despite acknowledging that the Verified Petition did, in fact, constitute a "Claim," Argo denied the Yellowstone Parties *any* coverage for the NYAG's enforcement action based on a series of contrived and bogus grounds, including that: (i) claims alleging intentionally false or misleading advertising or deceptive and unfair business practices are excluded under Insuring Agreement C; (ii) notice was untimely as to the Verified Petition;

(iii) amounts constituting civil fines, penalties, disgorgement, restitution and all sums paid in connection with injunctive relief fall outside the D&O Policy's definition of "Loss"; and (iv) the Yellowstone Parties lacked prior written consent to incur "Defense Costs," negotiate or agree to a settlement, or stipulate to judgment. *See* Exhibit Q.

**D.    The Yellowstone Parties Incur Substantial Defense Costs and Suffer Catastrophic Losses.**

60.    The financial impact of the NYAG's investigation and enforcement action has been truly catastrophic for the Yellowstone Parties.

61.    The fees paid to Proskauer Rose LLP for its defense of the Yellowstone Parties (including the four individual officers) from September 2022 until early 2024 totaled nearly $6 million.

62.    Thus, the legal fees incurred exceeded the D&O Policy's $3 million limit before the NYAG Enforcement Action was even filed.

63.    Mr. Stern then incurred more than $1 million in Defense Costs associated with the independent representation of Messrs. Stern and Reece by Harris St. Laurent & Wechsler LLP, whose services included internal analysis of the NYAG's claims and the corresponding exposure, significant motion practice, and protracted and extraordinarily complex settlement negotiations.

64.    And Yellowstone incurred more than $1.8 million to fund its own defense through Calcagni & Kanefsky LLP from early 2024 through the final resolution of the NYAG Enforcement Action.

65.    Thus, the total legal fees and costs incurred by the Yellowstone Parties amount to approximately $9 million, or roughly three times the D&O Policy's $3 million limit.

66.    But that is just the tip of the iceberg.  In addition to the Yellowstone Parties paying $16.1 million as monetary relief, they were required to walk away from $534,552,724 in purchased receivables as part of the settlement.

67.    As a result, the aggregate Loss suffered by the Yellowstone Parties is approximately **180 times greater** than the D&O Policy Limit.

**E.    The Yellowstone Parties Satisfy the ADR Requirement.**

68.    By notice dated September 9, 2024, the Yellowstone Parties advised Argo of their election to submit the present dispute to non-binding mediation.

69.    Through subsequent communications, counsel for the parties appointed the Honorable Steven M. Gold (Ret.) of the JAMS-New York Resolution Center to serve as the non-binding mediator.

70.    On August 28, 2025, the parties and their respective counsel held a mediation session with Judge Gold.

71.    The mediation session was unsuccessful.

72.    The Yellowstone Parties terminated the mediation on August 28, 2025.

73.    It has now been more than 90 days since the non-binding mediation was terminated.

74.    Accordingly, the Yellowstone Parties are permitted to file and prosecute this action.

## CAUSES OF ACTION

### FIRST COUNT
**(Breach of Contract)**

75.    The Yellowstone Parties repeat and re-allege the foregoing allegations as if fully set forth herein.

76.    The D&O Policy is a valid and enforceable contract.

77.    Argo had a contractual obligation under the D&O Policy to, among other things, defend, indemnify, and reimburse the Yellowstone Parties for all "Losses" suffered in connection with a covered "Claim" up to a Maximum Aggregate Limit of Liability of $3 million.

78.    Argo breached its contractual obligations under the D&O Policy by failing and refusing to provide coverage without any legitimate legal basis or justification.

79.    As a direct and proximate result of Argo's breaches, the Yellowstone Parties have suffered substantial damages.

80.    As detailed above, the Defense Costs incurred by the Yellowstone Parties alone are equal to or exceed that the D&O Policy's $3 million limit.

81.    In addition, the Yellowstone Parties paid $16.1 million and walked away from $534,552,724 in purchased receivables as part of their settlement with the NYAG.

82.    In other words, the aggregate losses suffered by the Yellowstone Parties are 180 times greater than the $3 million policy limit.

**WHEREFORE**, the Yellowstone Parties demand judgment against Argo for: (i) compensatory damages; (ii) pre- and post-judgment interest; (iii) reasonable counsel fees and costs; and (iv) such other relief as the Court deems to be just and proper.

## SECOND COUNT
### (Bad Faith)

83.    The Yellowstone Parties repeat and re-allege the allegations in the foregoing paragraphs as if fully set forth herein.

84.    Implicit in every contract issued in New Jersey is a covenant of good faith and fair dealing.

85.    Argo acted in bad faith by denying coverage without any legitimate legal or factual basis or justification for doing so when the existence of coverage of was not, by any reasonable measure, fairly debatable; taking wholly inconsistent and contradictory positions with respect to coverage for the FTC Action versus the NYAG Enforcement Action; purposely delaying its coverage decision; and placing its own financial interests over those of its insureds.

86.    By way of example, but far limitation:

(a)    Argo refused to accept the Company Subpoena as a "Claim" under the D&O Policy even though the Company Subpoena clearly constituted both "an administrative or regulatory proceeding" and "a civil, criminal, administrative or regulatory investigation" within the meaning of a "Claim."

(b)    Argo maintained that it did not receive notice of the NYAG's Enforcement Action "as soon as practicable" when, in fact, (i) Argo expressly acknowledged that the Company Subpoena served upon Yellowstone in 2018 was a "notice of circumstances" that later gave rise to formal claims asserted by the NYAG, (ii) the D&O Policy plainly states that any subsequent claim arising from those circumstances "shall be deemed to have been first made at the time of the notification of circumstances for the purpose of establishing whether such subsequent **Claim** was first made during the **Policy Period,**"  and (iii) in 2020, Argo determined the substantively similar FTC Action was "interrelated" to the Company Subpoena issued by the NYAG,

concluded that the claims made by the NYAG and FTC would be treated as a single claim, deemed the December 2018 date on which it received notice of the Company Subpoena to be the date on which it received first notice of that single claim, and defended and indemnified Mr. Stern in connection with the FTC Action.

(c)      Argo maintained that it did not receive notice of the Tolling Agreement, which Argo deemed to be a "Claim," even though Argo determined that the substantively similar FTC Action was "interrelated" to the Company Subpoena issued by the NYAG, concluded that the claims made by the NYAG and FTC would be treated as a single claim, and deemed the December 2018 date on which it received notice of the Company Subpoena to be the date on which it received first notice of that single claim, long before the Tolling Agreement was even entered.

(d)      Argo relied on the Business Practices Exclusion to deny coverage in its entirety despite the fact that (i) the NYAG's allegations of false or deceptive practices represent only a small component of the claims asserted against the Yellowstone Parties, and (ii) even if that were not the case, the Business Practices Exclusion does not apply to Mr. Stern, who himself incurred defense costs and suffered losses in excess of the D&O policy's $3 million limit.

(e)      Argo invoked the "consent" provision even though it had notice of the NYAG's investigation for more than five years before the Enforcement Action was even initiated and there was no scenario under which any of the insureds could have defended or settled the case within the policy limit.

(f)      Argo cited the D&O Policy's exclusion of coverage for losses related to civil fines, penalties, disgorgement, restitution, or otherwise in connection with injunctive relief to deny the Yellowstone Parties coverage for any of the many millions of Defense Costs it incurred

or the more than $500 billion in Losses it suffered even though (i) Defense Costs are expressly covered and they alone far exceeded the D&O Policy limit, (ii) the bulk of the injunctive relief sought by the NYAG does not pertain to the Yellowstone Parties because they stopped taking on new business before the enforcement action was even commenced, (iii) the $16.1 million in settlement monies paid by the Yellowstone Parties were not attributed to any particular claim or request for relief, and (iv) Argo took the exact opposite position and provided coverage to Mr. Stern (and other officers and directors) for the FTC Action through which the FTC, like the NYAG, also sought a wide array injunctive relief, penalties, and fines.

(g)    Argo waited more than seven months and until it was served with notice of the Yellowstone Parties' intent to pursue the company's internal appeals process before issuing its baseless coverage decision.

87.    Argo's actions were willful, wanton, malicious, and in reckless disregard of the Yellowstone Parties' rights.

88.    As a direct and proximate result of Argo's bad faith conduct, the Yellowstone Parties have suffered substantial damages.

**WHEREFORE**, the Yellowstone Parties demand judgment against Argo for: (i) compensatory damages; (ii) consequential damages; (iii) punitive damages; (iv) counsel fees and costs; and (v) such other relief as the Court deems just and proper.

**THIRD COUNT**
**(Declaratory Judgment)**

89.    The Yellowstone Parties repeat and re-allege the foregoing allegations as if fully set forth herein.

90.    It is the position of the Yellowstone Parties that they were entitled a defense and indemnification under the D&O Policy and are entitled to reimbursement of the Defense Costs

and other Losses they have suffered up to the aggregate policy limit of $3 million.

91.     It also is the position of the Yellowstone Parties that Argo had no legitimate basis whatsoever for declaring that it did not receive adequate notice of the NYAG's Enforcement Action or denying coverage under the D&O Policy for any of the manufactured reasons presented.

92.     Notwithstanding the clear and unambiguous language of the D&O Policy and the irrefutable fact that the NYAG Enforcement Action falls squarely within the scope of coverage, Argo maintains that it had valid grounds to deny coverage and invoke the exclusions and other policy terms it did in support of that decision.

93.     As a result, Argo has created an actual and justiciable controversy as to the Yellowstone Parties' rights under the D&O Policy.

94.     This controversy is directly and substantially impairing the parties' rights and legal interests and is of sufficient immediacy and reality to warrant the declaratory relief requested herein.

95.     The declaratory relief will have a real and substantial effect on the parties.

**WHEREFORE,** the Yellowstone Parties demand judgment against Argo: (i) declaring that the NYAG Enforcement Action is a covered "Claim" under the D&O Policy and that the Yellowstone Parties are entitled to payment for all Defense Costs incurred and Losses suffered up to the aggregate policy limit of $3 million; (ii) awarding the Yellowstone Parties reasonable counsel fees and costs; and (iv) awarding the Yellowstone Parties such other relief as the Court deems equitable and just.

Respectfully submitted,

Dated: November 26, 2025          By:          */s/ Eric T. Kanefsky*
      Newark, New Jersey                              Eric T. Kanefsky (024292002)
                                          CALCAGNI & KANEFSKY LLP
                                          One Newark Center
                                          1085 Raymond Boulevard, 18th Floor
                                          Newark, New Jersey 07102
                                          E: eric@ck-litigation.com
                                          T: (862) 397-1796

                                          *Counsel for Plaintiffs*